1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MON RITH, DALIS SUN, SUPER VIDEO )
INC., doing business as GROCERY PLUS, )
                                  )
                      *Plaintiffs*, )
                                  )
             v.                          )
                                    )
UNITED STATES OF AMERICA,      )
                                    )
                     *Defendant*. )
                                    )

CASE NO. 2:19-cv-01582-BJR

ORDER GRANTING UNITED STATES'
MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

       Plaintiffs Mon Rith, Dalis Sun, and Super Video, Inc., *dba* Grocery Plus, initiated the present action seeking to overturn the Food and Nutrition Service's ("FNS") permanent disqualification of their specialty grocery store from participating in the Supplemental Nutrition Assistance Program ("SNAP"). *See* Compl., Dkt. No. 1. Before the Court is the United States' Motion for Summary Judgment seeking dismissal of Plaintiffs' suit, arguing there are no triable facts to contradict the conclusion that Plaintiffs illegally trafficked in SNAP benefits. Mot. for Summ. J., Dkt. No. 18 ("Mot."). Having reviewed the Motion, the opposition thereto, the record of the case, and the relevant legal authorities, the Court will grant the Motion. The reasoning for the Court's decision follows.

## II.      BACKGROUND

### A. Statutory Background

SNAP, the successor to "food stamps," offers food benefits to qualifying individuals and families with financial hardships.  *See* 7 U.S.C. § 2011 *et seq.*; *see also South Hill Mkt. v. United States*, No. 19-cv-00073, 2020 WL 4043819, at *1 (E.D. Wash. July 17, 2020).  The Program is administered by FNS, which is a division of the Department of Agriculture.  SNAP operates similarly to a debit card, in which benefits are transferred to participants through an Electronic Benefits Transfer ("EBT") card.  Participants may then spend their SNAP benefits by purchasing eligible items sold by approved SNAP retailers.  *See* 7 U.S.C. § 2018 (Approval of Retail Food Stores and Wholesale Food Concerns); 7 C.F.R. § 278.1.

SNAP regulations prohibit "trafficking" in SNAP benefits, which is defined as "[t]he buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food . . .."  7 C.F.R. § 271.2.  In order to detect trafficking, every purchase made with an EBT card is recorded and stored in a national database.  *See* Am. Decl. of Frederick Conn, Dkt. No. 34 ¶ 10 ("Conn Decl.").  FNS utilizes the "Anti-Fraud Locator using Electronic Retailer Transactions," or "ALERT," system to monitor the national database and generate reports of suspicious patterns of transactions that suggest trafficking.  *Id.* ¶¶ 11–12.

The penalty for approved retailers found to have trafficked in benefits is permanent disqualification of the retailer from participation in the Program, assessment of a civil monetary

2

penalty ("CMP"),[1] or both.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a); 7 C.F.R. § 278.6(e)(1).  If, after administrative proceedings, a retailer is found to have trafficked in SNAP benefits and disqualified from participation in the Program, the retailer may file a complaint in federal district court to challenge their administrative disqualification.  7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

**B. Factual Background**

Mr. Rith and Ms. Sun are the married proprietors and sole mangers of Grocery Plus. Compl. ¶¶ 2, 7–8; *see also* Mot. at 4–5, 6–7.  They are Cambodian immigrants and their store specializes in Cambodian goods popular among their local Cambodian community as well as the Vietnamese, Thai, Laotian, and Burmese immigrant communities.  The store itself is approximately 5,000 square feet, and offers both food and non-food items.  Based on its size, FNS classifies Grocery Plus as a "medium" grocery store.  Mot. at 4; A.R. 1.[2]

The store is located in the White Center neighborhood of Seattle.  Plaintiffs contend that White Center contains a "high concentration of low-income, immigrant, and refugee households" and, thus, SNAP transactions make up approximately 60–70% of Grocery Plus's total sales. Compl. ¶ 7; Pls.' Opp'n to United States' Mot. for Summ. J., Dkt. No. 21 at 3–5 ("Resp."); Decl. of Mon Rith, Dkt. No. 23 ¶ 12 ("Rith Decl.").  Plaintiffs also claim that those in the Cambodian

---

[1] In order for a CMP to be available in lieu of a permanent disqualification resulting from trafficking, a retailer under investigation must timely submit evidence that it has "established and implemented an effective compliance policy." 7 C.F.R. § 278.6(i).  In this case, there is no dispute that Plaintiffs have not submitted such evidence.

[2] FNS has provided a redacted copy of the administrative appeal record used in sustaining Plaintiff's permanent disqualification from SNAP.  *See* Decl. of Shanta Swezy, Dkt. No. 35 (Chief of the Administrative Review Branch of the Retailer Policy and Management Division); Decl. of Shanta Swezy, Ex. A, Dkt. No. 35-1 (Redacted Administrative Record).  From here on, the Court will refer to exhibits within the Administrative Record as "A.R." followed by their Administrative Record Bates number.

community that do not live in White Center will often travel from across the Seattle area to Grocery Plus for its specialized offerings.  Rith Decl. ¶ 6.

The store itself has only one small checkout counter with two cash registers and two EBT Point of Sale devices.  *See* Mot. at 5–6; A.R. 112, 115, 118, 123.  That counter does not have an optical scanner, meaning that items must be rung up manually.  The store also does not have any large shopping carts, only small, handheld and wheeled baskets customers can use while shopping, although the owners have access to three large hand trucks used to carry bulk items directly to customers' cars.  *See* Rith Decl. ¶ 8; Mot. at 6–7; *see also* A.R. 96, 122.

According to Plaintiffs, Grocery Plus offers many expensive and bulk SNAP eligible items, such as bulk rice for $42.99, coffee for $55.00, sausage packs for $149.00, fish for $155.00, chicken wings for $97.00, and mangoes for $170.00, that can easily drive up shoppers' grocery bills.  Compl. ¶ 8; Rith Decl. ¶ 13.

Grocery Plus was first authorized to participant in SNAP on September 23, 2014.  Mot. at 5; A.R. 221.

## C. Investigative and Administrative Proceedings

In April 2019, FNS initiated an investigation of Grocery Plus based on patterns of suspicious transactions identified by the ALERT system between December 2018 and March of 2019 ("Review Period").  Mot. at 5; A.R. 220.  Specifically, the ALERT system identified four transaction patterns indicative of trafficking, which are at the center of this case:

(1) a large number of transactions ending in $.00 (also called "same-cents transactions");

(2) rapid, repetitive SNAP transactions involving the same SNAP household;

(3) depletion of the majority of a SNAP household's monthly benefits in a short

4

time frame; and

(4) a large number of high-dollar SNAP transactions.

A.R. 246, 249–264.

Pursuant to FNS's investigation, an FNS contractor conducted a store visit on April 26, 2019.  Mot. at 5–6; A.R. 96–127.[3]  While the store visit did not produce direct evidence of trafficking, *i.e.* acquiescence by the proprietor to engage in a benefit trafficking exchange, FNS prepared a Case Analysis Document which compared the four suspicious transaction patterns identified by the ALERT system with the contractor's Store Visit Report.  Mot. at 7–9; A.R. 219–45 ("Case Analysis Document").  Based on this analysis, FNS determined that Grocery Plus's physical layout, inventory, amenities, checkout practices, and pricing structure could not account for the identified transaction patterns, leaving only SNAP benefit trafficking to account for the irregularities.

Based on the Case Analysis Document's findings, on May 28, 2019, FNS issued Grocery Plus a Charge Letter pursuant to 7 C.F.R. § 278.6 formally charging Plaintiffs with trafficking.  Mot. at 9; A.R. 246–64 ("Charge Letter").  The Charge Letter identified the same four suspicious transaction patterns as recognized by the ALERT system and provided lists identifying the specific suspect transactions.  The Charge Letter also invited Plaintiffs to respond to the allegations and explain the anomalies.

---

[3] Plaintiffs also note that FNS contractors twice previously conducted store visits to Grocery Plus, which resulted in reports dated November 18, 2015 and December 10, 2018 finding no direct evidence of SNAP benefits trafficking. Resp. at 5; Decl. of Bardi Martin, Ex. A, Dkt. No. 22-1 (November 2015 Report); Decl. of Bardi Martin, Ex. B, Dkt. No. 22-2 (December 2018 Report).

5

On June 5, 2019, Plaintiffs responded through their attorney, including a one-page letter and 14 pages of supporting documentation.  Mot. at 9; A.R. 268–82.  The Letter attempted to explain each pattern identified by the Charge Letter and contained many of the same explanations made before this Court and discussed *infra*.

FNS reviewed these explanations and determined that they did not account for the suspicious activities.  This determination was memorialized in a Retailer Reply and Case Sanction Recommendation.  Mot. at 10; A.R. 285–91 ("Case Sanction Recommendation").  Based on this conclusion, FNS sent a letter on June 17, 2019, informing Plaintiffs that it formally determined that trafficking had occurred and that Grocery Plus would be permanently disqualified from SNAP participation.  Mot. at 11; A.R. 292–93.  The Letter also informed Plaintiffs that they had a right to request administrative review of FNS's determination.

Plaintiffs, through their counsel, timely applied for administrative review on June 26, 2019. Mot. at 12; A.R. 296.  On August 6, 2019, counsel submitted a letter brief in support of Plaintiffs' administrative appeal including numerous exhibits that have also been submitted before this Court. *See* Decl. of Ashley C. Burns, Ex. D, Dkt. No. 20-4.

Finally, on August 27, 2019, an Administrative Review Officer issued FNS's Final Agency Decision, which considered the evidence submitted by Plaintiffs, but ultimately found sufficient evidence to conclude tracking had occurred at Grocery Plus.  Mot. at 12–13; A.R. 331–44.  Based on that conclusion, the Final Agency Decision upheld Plaintiff's permanent disqualification.

**D.  Procedural History**

On October 3, 2019, Plaintiffs timely filed their Complaint in this Court seeking to overturn FNS's permanent disqualification pursuant to 7 U.S.C. § 2023 and 7 C.F.R. § 279.7.  Compl., Dkt.

No. 1.  The United States filed the currently-pending Motion for Summary Judgment on September 10, 2020.  Mot., Dkt. No. 18.

## III.    LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, a District Court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "An issue of material fact is genuine" where there is "sufficient evidence for a reasonable jury to return a verdict for the non-moving party," *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1104 (9th Cir. 2020) (quoting *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)), and a fact is "material," where it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While reviewing a motion for summary judgement, District Courts are "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *VHT, Inc. v. Zillow Grp., Inc.*, 461 F. Supp. 3d 1025, 1034 (W.D. Wash. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  Thus, District Courts must "accept the nonmoving party's evidence as true and draw all reasonable inferences in its favor," but, at the same time, the nonmovant may not "rest upon the mere allegations or denials of its pleading."  *South Hill Mkt.*, 2020 WL 4043819, at *2 (citing *Anderson*, 477 U.S. at 248–49, 255).  As such, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  *Khera v. United States*, No. 17-cv-1827, 2019 WL 2610966, at *6 (C.D. Cal. May 10, 2019) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171

(9th Cir. 1997).

The initial burden rests with the movant, who must demonstrate that there is no genuine dispute of material fact. *See VHT*, 461 F. Supp. 3d at 1034. If, as here, the movant does not bear the ultimate burden of persuasion at trial, the movant can meet its initial burden by either producing evidence negating an essential element of the nonmoving party's case or showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Id.* at 1033 (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)). If the movant meets this burden, the burden shifts to the nonmovant to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 250).

**B. Judicial Review of SNAP Disqualifications**

Review of FNS administrative disqualifications are conducted by "trial de novo" in federal court, meaning that the District Court "shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15); *see South Hill Mkt.*, 2020 WL 4043819, at *3.[4] During such a review, the District Court may "look beyond the administrative record and reach its own factual and legal conclusions." *Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169, 1177 (D. Haw. 2009).

---

[4] In addition to reviewing whether a violation occurred, judicial review of administrative disqualifications can involve a second question, "[i]s the penalty valid?" *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir. 1986). Plaintiffs, however, have not challenged the imposition of the permanent disqualification as "arbitrary or capricious." *See generally*, Compl., Dkt. No. 1; Resp., Dkt. No. 21; *see also Young Choi*, 639 F. Supp. 2d at 1177 ("[i]f the court finds a valid violation . . . it reviews the penalty FNS imposed on the store based on an arbitrary and capricious standard").

During a District Court's review of an administrative disqualification, the retailer bears the burden of proving by a "preponderance of the evidence that the violations did not occur." *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997). In reviewing the evidence presented, a SNAP retailer does not need to be caught "red-handed" committing trafficking violations in order to be disqualified as a "retailer's disqualification may be upheld upon evidence of 'irregular and suspicious activity[.]'" *South Hill Mkt.*, 2020 WL 4043819, at *3; *see also Capellan v. United States*, No. 17-cv-9342, 2020 WL 1047907, at *4 (S.D.N.Y. Mar. 4, 2020) ("[a] pattern of suspicious transactions can be sufficient evidence for FNS's disqualification determination to be valid"). This is based on the fact that statute permits FNS to base its disqualification on patterns identified through EBT transaction reports, such as those generated by the ALERT system. 7 U.S.C. § 2021(a)(2) ("disqualification shall result from a finding of violation on the basis of evidence that may include . . . inconsistent redemption data [and] evidence obtained through a transaction report under an electronic benefit transfer system"); *see also* 7 C.F.R. § 278.6(a). Thus, unexplained suspicious transaction patterns, such as the four identified in this case, may be sufficient to uphold a disqualification.

Statute also provides that FNS is entitled to penalize offending retailers with permanent disqualification on the first instance of trafficking. 7 U.S.C. § 2021(b)(3)(B) ("a disqualification. . . shall be . . . permanent upon . . . the first occasion . . . of a disqualification based on . . . trafficking in coupons[.]"). To meet their burden, Plaintiffs must refute "each cited instance of trafficking." *Capellan*, 2020 WL 1047907, at *4 (quoting *SS Grocery, Inc. v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 340 F. Supp. 3d 172, 180 (E.D.N.Y. 2018)); *see also Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000) ("[s]ince permanent disqualification is warranted on the

9

first occasion of coupon trafficking, it is Plaintiff's burden to raise material issues of fact as to each of the transactions set forth as suspicious by the FNS") (internal quotations omitted).

## IV.   DISCUSSION

### A. Reviewable Evidence

Prior to contesting the merits of FNS' trafficking claims, Plaintiffs attack the admissibility of the evidence upon which the United States bases its Motion.  Resp. at 10–14.  It is axiomatic that in ruling on a motion for summary judgment the Court must only consider admissible evidence.  *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773–74 (9th Cir. 2002).

First, Plaintiffs claim that several declarations and affidavits submitted by the United States along with its Motion were not properly authenticated or attested to.  Resp. at 10–14 (challenging consideration of (1) Decl. of Ashley C. Burns, Exs. B, C, Dkt. Nos. 20-2, 20-3 and (2) Decl. of Frederick Conn, Dkt. No. 19).  The United States has resubmitted these declarations and affidavits with the proper authentications and attestations.  *See* Decl. of Ashley C. Burns, Exs. A, B, Dkt. Nos. 33-1, 33-2; Conn Decl., Dkt. No. 34; Decl. of Shanta Swezy, Dkt. No. 35; Decl. of Shanta Swezy, Ex. A, Dkt. No. 35-1.  Given the resubmissions, the Court will consider this evidence in reaching its decision.

Second, Plaintiffs challenge consideration of the Case Analysis Document and Case Sanction Recommendation as hearsay.  Resp. 14.  These documents represent FNS's consideration of the ALERT system's identified trends, the FNS contractor's store visit, and Plaintiffs' proffered explanations resulting in the determination that trafficking occurred at Grocery Plus.  *See supra* at 5, 6.  The United States contests that these documents are hearsay and, even if they are, it argues that they are admissible under a host of exceptions.  United States' Reply in Further Support of

10

Mot. for Summ. J., Dkt. No. 32 at 8–11 ("Reply").  The Court need go no further than to recognize, however, that the standard for admission of evidence during the summary judgment stage is "lenient" and that the Court may consider evidence in inadmissible form "if the evidentiary objections could be cured at trial."  *Watch v. City of Vacaville*, No. 17-cv-00524, 2020 WL 4059544, at *2 (E.D. Cal. July 20, 2020).  Thus, "[e]ven [] declarations that do contain hearsay are admissible for summary judgment purposes [if] they 'could be presented in an admissible form at trial.'"  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)).  Here, the United States attests to the availability at trial of Program Specialist Linda Petersen, the author of both the Case Analysis Document and Case Sanction Recommendation, to testify to the documents' contents.  Therefore, both documents are properly before the Court.

## B. Sufficiency of Evidence

### 1. Classification of Grocery Plus

Moving to the merits of FNS's disqualification, Plaintiffs first argue that all of the ALERT system's flagged transactions are skewed because FNS misclassifies Grocery Plus as a "medium grocery store" instead of a larger designation based on gross yearly sales, eligible food sales, and average monthly food sales.  Resp. at 15–17.  According to Plaintiffs, this is significant because the ALERT system bases its determination of suspicious patterns by comparing similarly sized stores.

The United States responds that Plaintiffs' challenge to Grocery Plus's classification does not create a genuine dispute of fact because Plaintiffs have not produced evidence contesting the application of FNS's criteria.  United States' Reply in Further Support of Mot. for Summ. J., Dkt.

No. 32 at 18–19 ("Reply").  The Court agrees.

The United States presents the testimony of Frederick Conn, who is employed as a Section Chief in FNS's Retailer Operations Division.  Mr. Conn explains that FNS determines "store type" based on "information [the retailer] provides to FNS with its applications, as further confirmed by [FNS] site visits, including the size of the store and the type and amount of inventory in the store." Conn Decl. at ¶ 5.  Plaintiffs primarily relies on the testimony of Linda Petersen, the previously mentioned Program Specialist who is employed in FNS's Investigative Analysis Branch.  *See* Resp. at 16.  But, Ms. Petersen testified that the Retail Operations Branch, not her own Investigative Analysis Branch, is tasked with store classification and that she is unfamiliar with their classification process or metrics.  Decl. of Bardi Martin, Ex. C, Dkt. No. 22-3 at 36:19–37:6 (Dep. of Linda Petersen).

The United States has asserted that based on the information Grocery Plus provided during its application to serve as a SNAP retailer, the store is correctly classified as a medium store. Plaintiffs' bald assertions that Grocery Plus is misclassified is not enough to raise a material dispute of fact because it has produced no evidence showing that it no longer meets the criteria of a medium store, or that it meets the criteria of a larger classification.

## 2.  Same-Cents Transactions

Moving to the specific patterns identified by the ALERT system, the United States argues that it is entitled to summary judgment because the evidence gathered by FNS in the form of hundreds of individual transactions and corroborated by the FNS contractor's site inspection cannot all be accounted for by Plaintiffs' proffered explanations.  First, for example, the United States points to the large number of same-cents transactions (transactions ending in $.00) as

12

evidence of trafficking because it is highly unlikely that these represent legitimate purchases as most items in the store are marked with prices ending in enumerated cents (such as $.99).  Mot. at 18–21.  The ALERT system flagged 112 EBT transactions ending in $.00 during the Review Period, a significant portion of which included a large dollar values.  A.R. 229–30, 249–51.  In addition, the United States points out that several EBT households appear to have conducted numerous same-cents transactions throughout the Review Period, all for identical amounts each time.  Mot. at 19 n.7 (citing A.R. 249).

Plaintiffs proffer only one explanation for this trend: they regularly round down to the nearest whole dollar for customers' convenience and that this practice is customary in Cambodian culture.  Resp. at 17.

District Courts have routinely held that a pattern of same-cents transactions is sufficient to affirm an FNS disqualification.  *See, e.g.*, *Capellan*, 2020 WL 1047907, at *5 ("payments ending in round numbers suggest that customers are paying for something other than the market's products"); *Kee Lee v. United States*, No. 11-cv-0881, 2013 WL 127752, at *8 (E.D. Cal. Jan. 9, 2013); *Young Choi*, 639 F. Supp. 2d at 1180; *Jackson v. United States*, No. 08-cv-02770, 2009 WL 941766, at *7 (N.D. Cal. Apr. 3, 2009); *SS Grocery*, 340 F. Supp. 3d at 180–81.

Further, these same courts have often rejected an alleged cultural practice of rounding as a sufficient explanation to defeat summary judgment where those practices could not explain every flagged transaction.  *See, e.g.*, *Kee Lee*, 2013 WL 127752, at *7 ("Distinctive practices of ethnic communities may explain why the pattern of food stamp usage in a store does not fit the expectations of the FNS, but such an explanation is insufficient to defeat a motion for summary judgment in the absence of proof as to specific transaction challenged.").  In *Kee Lee*, the court

rejected the explanation that cultural practices of rounding explained a large number of same-cents transactions where, as here, the only evidence of such a practice was the owner's affidavit attesting to its existence. *See id.* at *8 ("While the cultural explanation of even dollar transactions is reasonable, Plaintiff provides no solid record of this practice.").

Beyond the lack of cultural evidence, rounding simply does not explain the large number of same-cents transactions at issue in this case.  For example, Plaintiffs fail to explain why rounding down to the nearest whole dollar would be helpful in EBT transactions, which do not involve having to provide change like a cash transaction.  Thus, it is unclear why such a practice actually benefits a patron.  *See Jackson*, 2009 WL 941766, at *7 ("there appears to be no disadvantage to putting an uneven dollar amount on an EBT card, so this type of customer behavior makes no sense").  Further, rounding fails to explain the United States' observation that several households engaged in the exact same even dollar transaction multiple times in the Review Period. The United States highlights one household, for example, that completed transactions for exactly $126.00 three times, on January 8, 2019, January 20, 2019 and March 7, 2019.  *See* A.R. 249.  A cultural practice of rounding fails to explain how or why this household would spend the exact same amount in such close proximity down to the cent.

As it is Plaintiffs' burden to show by a preponderance of the evidence that trafficking did not occur, *Kim*, 121 F.3d at 1272, and the statute permits FNS to disqualify a retailer based on only one unexplained transaction, 7 U.S.C. § 2021(b)(3)(B), Plaintiff's failure to provide specific explanations to rebut the United States' evidence of trafficking based a large number same-cents transactions entitles the United States to summary judgment.

14

### 3. Rapid, Repetitive Transactions

The second set of suspicious transactions which resulted in FNS's disqualification of Grocery Plus involved rapid, repetitive transactions, that is a transaction in which the same SNAP household made two large-dollar-value purchases in an unusually short amount of time. Mot. at 21–22. Specifically, the ALERT system highlighted 12 such suspicious transaction sets in which an initial purchase was followed, often in minutes or seconds, by a second large transaction. A.R. 231–32; 252–53. Such transactions are suspicious, according to the United States, for three reasons. First, the second transaction in the set was often too large to represent just one or two forgotten items. Second, the second transaction in the set was often so large in dollar value, and conducted in such close proximity to the first, that it would be physically impossible for the cashier at Grocery Plus to ring up the second transaction as the store does not have an optical scanner. Third, in at least three of the 12 instances, the sum of the two transactions happened to be an even dollar amount. Because of the unlikeliness of these transaction patterns, the United States concludes it is more likely that these transactions represent Plaintiffs' attempts to hide trafficking by breaking one large suspicious transaction into two, smaller transactions. Illustrative is the following transaction: on January 23, 2019 one household first spent $27.62 and then 49 seconds later spent $90.38 for a total of exactly $118.00. The second transaction in this set is too large to represent a forgotten item; too large to have been rung up separately in the time stated without an optical scanner; greater than the first transaction making it unlikely that the customer purchased the first set and, upon realizing they had additional benefits, purchased the second; and not for a bulk item as the amount ($90.38) is not among the inventory list of bulk items provided by

Plaintiffs.  *See* Decl. of Brandi Martin, Ex. A, Dkt. No. 23-1 ("Inventory List").[5]

Plaintiffs reply with several explanations, including forgotten items, requests for additionally purchases by other family members after a transaction had been rung up, or that shoppers often separate items into two groups to ensure that they have sufficient benefits to purchase the first group before continuing with the second group.  Resp. at 17–18.

Like same-cents transactions, District Courts have consistently held that a pattern of rapid, repetitive large transactions is sufficient to affirm FNS's conclusion that trafficking likely occurred.  *See, e.g.*, *South Hill Mkt.*, 2020 WL 4043819; *Capellan*, 2020 WL 1047907; *Khera*, 2019 WL 2610966, at *6; *SS Grocery*, 340 F. Supp. 3d at 181; *Kee Lee*, 2013 WL 127752, at *8; *Young Choi*, 639 F. Supp. 2d at 1180; *Jackson*, 2009 WL 941766, at *7; *Kahin*, 101 F. Supp. 2d at 1303.  These same courts have often rejected many of the same explanations proffered by the Plaintiffs here.  *See e.g.*, *South Hill Mkt.*, 2020 WL 4043819, at *4 (rejecting explanation that customers split transactions into sets, buying bulk items separately or making additional purchases after realizing remaining benefits, where only supported by proprietor's self-serving affidavit); *Khera*, 2019 WL 2610966, at *6 ("Plaintiffs do not explain why customers would request to split a single large sale into multiple transactions on the same card"); *Jackson*, 2009 WL 941766, at *7 ("Although [the plaintiff]  argued that the smaller purchase could be of a forgotten item, the

_____

[5] The United States disputes the accuracy of this list.  *See* Mot. at 19–20 ("Among other things, the Administrative Review Officer noted that the inventory lists and photographs submitted by Plaintiffs in support of their Appeal were at odds with the Store Visit Report, which was completed in collaboration with the store's co-owner, Dalis Sun. None of the expensive items supposedly sold in bulk were on display as available for bulk sale during the Store Visit; no prices were posted for bulk items during the Store Visit; and the contractor who completed the Store Visit reported that no items were sold in bulk.") (Internal citations removed).

subsequent purchases were at times for amounts that exceeded a nominal, afterthought purchase amount.").

Of note, Plaintiffs' explanations do not address the specifics of the 12 transactions flagged by the ALERT system, but only describe trends observed by Plaintiffs in the abstract.  As stated earlier, since only one trafficking transaction is sufficient to uphold a permanent disqualification and Plaintiffs' explanations fail to explain the transaction highlighted by the Court above, *see supra* at 15–16, Plaintiffs' failure to refute the specific transactions is fatal.

### 4.   Transactions that Depleted the SNAP Household's Monthly Benefits

The United States highlights 67 suspicious sets of transactions conducted within the Review Period in which 39 SNAP households depleted their entire remaining SNAP balance in a single transaction or in multiple transactions conducted in a short timeframe, often minutes.  Mot. at 22–24; A.R. 232–33, 254–61.  As support for the suspicious nature of this spending pattern, the United States relies on a 2011 report by FNS's Office of Research and Analysis, which states that the average SNAP recipient gradually spends down their benefits over the course of a month, not in one large expenditure.  Mot. at 22; *See* Laura Castner and Juliette Henke, *Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program*, U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis, 11 (Feb. 2011) (the "2011 Report"), available at https://fnsprod.azureedge.net/sites/default/files/ARRASpendingPatterns.pdf.

Plaintiffs attempt to explain this pattern by claiming that many of their customers have large families and prefer to "purchase enough food at one time to last for weeks."  Resp. at 18.  Further, they claim, some of their Cambodian customers travel from across the Seattle region and, thus, prefer to stock up all at once, often exhausting their benefits.  *Id.* at 19.

17

Plaintiffs' explanations do not address the specific transactions relied on by the United States, but rather proffer generalized observations supported by self-serving affidavits.   For example, one transaction set highlighted by the United States occurred on January 17, 2019 in which a household first checked their balance and then depleted the remaining balance of $505.00 35 seconds later.   Again, it would seem impossible without an optical scanner to ring up multiple items that total exactly $505.00 in 35 seconds after just learning the precise amount of benefits remaining.   Having a large family or traveling some distance to the store—the generalized explanations proffered by the Plaintiffs—does not account for this suspicious transaction.

Again, as with the two previous transaction patterns, District Courts have consistently held that a pattern of transactions that deplete a household's monthly benefits in a single transaction or in multiple transaction that occur in a short period of time is indicative of trafficking.   *See, e.g.*, *SS Grocery*, 340 F. Supp. 3d at 181–82; *Kee Lee*, 2013 WL 127752, at *8; *Jackson*, 2009 WL 941766, at *7.   Additionally, these courts have rejected explanations similar to those advanced by Plaintiffs here.   *See SS Grocery*, 340 F. Supp. 3d at, 182 ("it is highly implausible that beneficiaries would choose to exhaust all of their benefits in one day at a small grocery store when there are larger stores nearby with a much wider selection of eligible items").   The court in *SS Grocery* also relied on the 2011 Report to find that a pattern of purchases similar to that highlighted by the United States here which ran against the Report's findings was indicative of trafficking.   *See id.*

As such, Plaintiffs have failed to create a dispute of fact as to the United States' proof that trafficking occurred as indicated by a large number of transactions that depleted the SNAP household's monthly benefits.

### 5.   Excessively Large Transactions

Finally, the United States relies on proof of a pattern of excessively large transactions. Mot. at 24–26.   According to the United States, 164 transactions during the Review Period are suspect based on their total dollar value (being over at least $100 with 30 of those over $300) given the size, inventory, and layout of Grocery Plus.   *Id.* at 24; A.R. 233, 262–64.   For example, the United States relies on the average transaction amount at a medium grocery store in King County—$29.29—to highlight how incongruous a greater than $100.00 purchase is, especially in the number that occurred at Grocery Plus.   A.R. 236.   Additionally, the United States argues, it would be difficult for customers to carry hundreds of dollars' worth of goods to the cash register without large shopping carts and hard for the proprietors to ring up such a large amount of goods in the store's small checkout counter.   Finally, several of the flagged excessively large transactions are for whole dollar, same-cents, amounts.   *See, e.g.* A.R. 233 (including 4 transactions out of 14 highlighted transactions ending in $.00).

Plaintiffs respond by relying on the goods it purports to sell in bulk and on its customers' shopping habits previously elaborated.   Resp. at 19–20; *see also* Inventory List, Dkt. No. 23-1.[6] They have also previously provided photographs along with their administrative appeal letter purporting to display many expensive and bulk items stocked in the store.   *See* Decl. of Ashley C. Burns, Ex. D at GP 46–198.   Finally, they present standardized affidavits from several customers each attesting to having spent over $100 at Grocery Plus.   Dkt. Nos. 25–31.

---

[6] Plaintiffs also argue that the transactions flagged by the United States are misleading as compared to other medium grocery stores because Grocery Plus is misclassified.   Resp. at 19.   As discussed previously, Plaintiffs have not presented sufficient evidence to challenge the store's classification.   *See supra* at 11–12.

19

As with the previous transaction patterns, District Courts have found a pattern of excessively large purchases to be indicative of trafficking.  *See, e.g.*, *South Hill Mkt.*, 2020 WL 4043819, at *3–*4; *Capellan*, 2020 WL 1047907, at *6 (large purchases suspect when combined with other suspicious factors such as large, same-cents transactions); *SS Grocery*, 340 F. Supp. 3d at 182–83; *Young Choi*, 639 F. Supp. 2d at 1179; *Jackson*, 2009 WL 941766, at *9 (finding suspicious large, same-cents transactions).  At the same time, several District Courts have found that explanations such as those offered by Plaintiffs raised a dispute of fact as to excessively large transactions, precluding summary judgment.  *See Bashir v. United States*, No. 17-cv-02553, 2019 WL 1877604, at *4–*5 (C.D. Cal. Mar. 26, 2019); *Sue Tha Lei Paw v. United States*, No. 17-cv-0532, 2018 WL 1536736, at *4 (S.D. Cal. Mar. 29, 2018).

As previously noted, a dispute of facts exists over the authenticity of the Inventory List and photographs presented by Plaintiffs as the United States claims that many of the items presented on the list or in photographs were not present or available during the FNS contractor's store visit. Mot. at 19–20, 25–26.  Plaintiffs claim the contractor's report is inaccurate.  Resp. at 6.  A large number of expensive items would account for large purchases, precluding summary judgment. Additionally, while the United States contests the validity of the affidavits Plaintiffs present from their customers, Reply. at 15–16 n.5, it is not for the Court on summary judgment to make credibility determinations, *see Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).  Plaintiffs have also presented testimony that they have three large hand trucks used to carry bulk items directly to customers' cars, explaining how such bulk items could be transported in the absence of large shopping carts.  *See* Rith Decl. ¶ 8.  Thus, disputes of fact exist as to the excessively large transaction pattern precluding summary judgment as to this issue.

20

## V.    CONCLUSION

While a dispute of fact exists over the excessively large transaction pattern, Plaintiffs have failed to raise a dispute of fact as to the other three observed suspicious transaction patterns.  As a single trafficking transaction warrants permanent disqualification from participation in SNAP, the Court hereby GRANTS the United States' Motion for Summary Judgement.

DATED this 17th day of December, 2020.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

21